IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| KATRINA EVANS, | ) | |
| | ) | |
| Plaintiff, | ) | 8:12CV335 |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | MEMORANDUM AND ORDER ON |
| Commissioner of the Social Security | ) | REVIEW OF THE FINAL DECISION |
| Administration, | ) | OF THE COMMISSIONER OF THE |
| | ) | SOCIAL SECURITY |
| Defendant. | ) | ADMINISTRATION |
| | ) | |

On September 20, 2012, Katrina Evans filed a complaint against Michael J. Astrue, who was then serving as Commissioner of the Social Security Administration.[1] (ECF No. 1.) Evans seeks a review of the Commissioner's decision to deny her applications for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq., and for Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. See 42 U.S.C. §§ 405(g) and 1383(c)(3) (providing for judicial review of the Commissioner's final decisions under Titles II and XVI). The Commissioner has filed an answer to the complaint and a transcript of the administrative record. (See ECF Nos. 11-12.) In addition, the parties have filed briefs in support of their

---

[1] On February 14, 2013, Carolyn W. Colvin was appointed to serve as Acting Commissioner of the Social Security Administration; shortly thereafter, she was automatically substituted as a party in this case pursuant to Federal Rule of Civil Procedure 25(d). (See Notice of Substitution, ECF No. 10.)

1

respective positions.  (See Pl.'s Br., ECF No. 14; Def.'s Br., ECF No.19.)  I have carefully reviewed these materials, and I find that the case must be remanded for further proceedings.

## I.   BACKGROUND

Evans filed an application for disability insurance benefits on May 3, 2005. (Transcript of Social Security Proceedings (hereinafter "Tr.") at 25, 60-62.)  Her application was denied on initial review, (id. at 25, 55-58), and on reconsideration, (id. at 24, 48-52).  Evans then requested a hearing before an ALJ.  (Id. at 45.)  This request was granted, and a hearing was held on June 17, 2008.  (E.g., id. at 343.)  In a decision dated July 17, 2008, the ALJ concluded that Evans "was not under a disability as defined in the Social Security Act, at any time from December 21, 2004, the alleged onset date, through March 31, 2008, the date last insured."  (Id. at 23 (citation omitted).  See also id. at 13-22.)  Evans requested that the Appeals Council of the Social Security Administration review the ALJ's decision.  (Id. at 12.)  This request was denied.  (Id. at 5-7.)

On December 29, 2008, Evans filed a complaint in this court seeking a review of the Commissioner's decision to deny her claim for benefits.  See Evans v. Astrue, No. 4:08CV3266 (D. Neb. December 29, 2008).  United States District Judge Richard G. Kopf determined that the ALJ erred by failing to address adequately the opinions of Janet Duba, RN, APRN, and he ordered that the case be remanded to the Commissioner for further proceedings.  Evans v. Astrue, No. 4:08CV3266 (D. Neb. April 22, 2010).  In accordance with this order, the Appeals Council vacated the Commissioner's decision and directed an ALJ to conduct further proceedings.  (Tr. at 423.)  The Appeals Council also noted that Evans filed an application for SSI

benefits on April 20, 2010, and ordered that the ALJ "consolidate the claims and issue a decision on the consolidated claims."  (Id.)

A second hearing was held before a different ALJ on October 15, 2010.  (Id. at 584.)  In a decision dated October 22, 2010, the ALJ concluded that Evans "has not been under a disability, as defined in the Social Security Act, from December 9, 2004, though the date of this decision."  (Id. at 408.  See also id. at 397-407.)  Evans requested that the Appeals Council review the decision, (id. at 396), and this request was denied on July 31, 2012, (id. at 391).  Thus, ALJ's decision of October 22, 2010, now stands as the Commissioner's final decision.

## II.   SUMMARY OF THE RECORD

On a Disability Report form, Evans claimed that she became disabled on December 20, 2004, due to multiple sclerosis (MS), fatigue, depression, and anxiety. (Tr. at 425, 429.)  She was 30 years old on the alleged onset date, and she completed two years of college education.  (Id. at 425, 430.)  She has work experience in department store sales and as a server in restaurants.  (Id. at 431.)

### A.   Medical Evidence[2]

Records indicate that Janet Duba, RN, APRN, began treating Evans on August 28, 2002, for  mood-related mental health problems.  (Tr. at 183.)  Evans visited Nurse Duba approximately seven times between August 28, 2002, and the alleged onset date.  (See, e.g., id. at 189-95.)  On March 13, 2003, Nurse Duba diagnosed "Bipolar NOS probably type II," and prescribed Abilify.  (Id. at 193.)  Soon after,

---

[2] My review of the medical evidence emphasizes the records cited by the parties in their briefs.  (See Pl.'s Br. at 3, 5-8, ECF No. 14; Def.'s Br. at 2-12, ECF No. 19.)

Evans reported that she "really like[d]" the effects of her medication, and records dated September 29, 2003, March 30, 2004, and September 13, 2004, indicate that Evans had been suffering no panic attacks.  (Id. at 189-92.)

On March 1, 2005, Evans visited Rebecca Steinke, M.D.,[3] and reported weakness and vision problems in her left eye.  (Id. at 126.)  She also reported that she had been feeling "heaviness or clumsiness in the left arm and left leg" at about the same time that her vision problems developed.  (Id.)  Dr. Steinke ordered a CT of the head and other tests.  (Id. at 125.)  An MRI of the brain performed on March 3, 2005, revealed "two questionable white matter lesions in the supratentorium white matter" and apparent "demyelination in the lateral aspect of the pyramidal tracts of the left side of the medulla [that] is strongly suspicious for multiple sclerosis."  (Id. at 132.) Also on March 3, 2005, Evans visited Michele Gleason, M.D., for an assessment of her vision problems.  (Id. at 213.)  Evans reported to Dr. Gleason that during the past two weeks, she had been seeing double when looking left, and she was experiencing blurred vision.  (Id.)  Dr. Gleason diagnosed "diplopia on [left] far gaze" and possible lateral rectus weakness of the left eye, and Evans was directed to return for a follow-up in one month.  (Id.)

On March 4, 2005, Evans visited Ahmed Sadek, M.D., for a neurological evaluation.  (Id. at 206-08.)  Evans complained of depression, forgetfulness, occasional headaches, weight loss, numbness, excessive sweats, poor appetite, nausea, stomach pains, blurred vision, double vision, "flashes of vision," halos, hot flashes, and pain in her arms, legs, feet, and hands.  (Id. at 206-07.)  Dr. Sadek

---

[3] The defendant represents that Evans visited Dr. Steinke on this date.  (See Def.'s Br. at 2, ECF No. 19.)  The record itself bears initials that may correspond to Dr. Steinke, but does not otherwise appear to identify her.  (See Tr. at 126-26.)

diagnosed "Possible MS (in exacerbation)," and wrote:

> The findings noted and her current symptoms and neurologic examination raises concern for dissemination in space and time which usually is seen in multiple sclerosis relapse and remitting type. On the other hand her MRI findings are very subtle and based on the recommended criteria used for diagnosis of MS based on MRI finding she at best would fall into the possible MS category.

(Id. at 207-08.) Dr. Sadek recommended various tests and treatments, and he advised Evans to follow up in six weeks. (Id. at 208.)

On March 22, 2005, Evans visited Nurse Duba and reported that she was feeling angry about her MS diagnosis. (Id. at 188.) Nurse Duba indicated that Evans' condition had worsened, continued her prescriptions, and directed her to return for a follow-up. (Id.)

Evans followed up with Nurse Duba on April 19, 2005, and reported feeling discouraged and useless. (Id. at 187.) Nurse Duba also noted that Evans had a "pronounced limp." (Id.) Evans' Paxil was continued, and her Remeron dosage was increased. (Id.)

On April 21, 2005, Evans returned for a follow-up and an IV treatment with Dr. Sadek. (Id. at 203-05.) Based on lab tests and MRIs of the spine revealing demyelineation, Dr. Sadek diagnosed "MS relapsing remitting." (Id. at 204.) Dr. Sadek advised Evans to begin physical therapy to improve the weakness in her lower extremities, and he started her on Avonex. (Id.)

Evans followed up with Dr. Gleason on April 27, 2005. (Id. at 211.) She reported that her diplopia remained but had improved, and Dr. Gleason directed her to return in two or three months. (Id.)

Evans visited Nurse Duba on May 17, 2005, and reported that she stopped taking Paxil. (Id. at 186.) She was feeling angry but was "not as depressed." (Id.)

She reported that physical therapy was helping her walk, but she was having problems with balance, numbness, and fine motor skills. (Id.) Nurse Duba noted that Evans had an improved mood and attitude, and she ordered no change in medication. (Id.) However, on May 26, 2005, Evans reported increased anxiety, and Nurse Duba ordered her to resume taking Paxil and continue with her Remeron. (Id. at 185.)

On June 23, 2005, Evans followed up with Dr. Sadek. (Id. at 201-02.) She reported that she suffered "a recent relapse that affected her lower extremities and caused her to have double vision," but her symptoms improved, and she was no longer "complaining of any major double vision or any weakness in the lower extremities." (Id. at 201.) She was taking Avonex "for disease control," Amantadine for fatigue," and Paxil "for depression and anxiety." (Id.) She was also taking Premarin and Xanax. (Id.) Evans' muscle strength, tone, and bulk was normal, as was her gait. (Id.) Dr. Sadek advised Evans to continue all of her medications and to "avoid direct sun, heat or any exposure to hot showers." (Id. at 202.)

Evans visited Nurse Duba on July 12, 2005, and reported that she quit taking her Remeron, but was continuing to take Paxil. (Id. at 184.) She also reported that she was sleeping well, and her walking and vision were better. (Id.) Nurse Duba noted that Evans' condition was improved. (Id.)

On July 26, 2005, Evans followed up with Dr. Gleason and reported that she was experiencing pain around her eye. (Id. at 210.) Dr. Gleason noted that Evans' eye pain could be secondary to a strain. (Id.)

Alan Smith, Ph.D., examined Evans on July 28, 2005, and prepared a psychological report dated August 6, 2005. (Id. at 143-50.) Evans told Dr. Smith that she wanted to provide foster care for children, and she was having difficulty accepting that she might not be able to do so due to her illness. (Id. at 144-45, 146.)

6

She said that she had been advised "to avoid all stress and to discontinue working and to seek Social Security support." (Id. at 145.)  She explained that she first began to suffer depression in her early twenties, and her panic disorder began after she underwent a hysterectomy at approximately age 27. (Id. at 146.)  She was prescribed Paxil and Xanax, and she underwent counseling.  (Id.)  Eventually she "worked herself back to a functional level," and she "was able to provide foster care to children." (Id.)  She said that she had symptoms of anxiety and depression after being diagnosed with MS, but "she has been able to manage them to this point in time." (Id.)

Dr. Smith administered a "mini-mental status exam," and Evans' "total score of 30 out of 30 possible points suggest[ed] no cognitive impairments." (Id. at 147.) However, Evans "did take a bit of time to perform serial 7s suggesting mild difficulty with working memory skills."  (Id.)  Testing also revealed Evans' "general intellectual skills are likely to fall solidly within the average range," and "high average" to "very superior" memory skills apart from working memory. (Id. at 147-48.)  Dr. Smith diagnosed "Adjustment Disorder with Mixed Anxiety and Depressed Mood," and a current GAF of "54, mild."[4] (Id. at 149.)  Dr. Smith wrote,

---

[4] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental health-illness.'" Pate-Fires v. Astrue, 564 F.3d 935, 937 n.1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994) (hereinafter DSM-IV)). "A GAF of 41 to 50 indicates the individual has '[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning . . . .'" Id. at 938 n.2 (quoting DSM-IV at 32).  "A GAF of 51 to 60 indicates the individual has '[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning . . . .'" Id. at 938 n.3 (quoting DSM-IV at 32).  A GAF of 61 to 70 indicates that the individual has "[s]ome mild symptoms . . . or some difficulty in

My prognosis for the occupational function of this individual based solely on her psychiatric syndromes or disorders is excellent. [Evans] does not reveal cognitive, emotional or behavioral problems that would interfere with her ability to perform work in any setting necessarily. The claimant does report [a] rather serious medical disorder affecting her ability to tolerate stress and to perform tasks generally. I refer the reader to medical records for discussion of the effects the claimant's multiple sclerosis has, upon her occupational function. [Evans] is an individual who appears to genuinely need productive activity on a regular basis. Hence, as the claimant adjusts to the limitations imposed by her multiple sclerosis, I would venture to guess that symptoms of anxiety and depression are likely to become exacerbated. I believe that as [Evans] has to fully face the nature of her medical disorder, she will begin to struggle psychologically. Hence, I would keep a close eye on Ms. Evans as she struggles with facing her disabling medical condition.

(Id. at 149-50.)

On August 11, 2005, Jerry Reed, M.D., reviewed the record and completed a "Physical Residual Functional Capacity Assessment." (Id. at 156-64.) Dr. Reed opined that Evans could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and engage in unlimited pushing and/or pulling within the aforementioned limits. (Id. at 157.) He also opined that Evans should never climb ladders, ropes, or scaffolds, and that she should avoid concentrated exposure to heat, cold, fumes, and hazards. (Id. at 158, 160.)

Evans visited Nurse Duba on September 26, 2005, and reported that she was not doing well. (Id. at 180.) Nurse Duba's notes suggest that Evans was "just off steroids" and her symptoms "moved to the opposite side." (Id.) Nurse Duba

---

social, occupational, or school functioning . . . , but [is] generally functioning pretty well . . . ." DSM-IV at 32.

instructed Evans to restart Remeron and directed her to follow up in one to two months. (Id.)

On September 29, 2005, Evans visited Dr. Sadek and reported that she was still experiencing numbness, weakness, pain, vision problems, and fatigue despite taking her medications, including Avonex and IV Solu-Medrol. (Id. at 198-99.) Dr. Sadek advised Evans that she "may be better off switching to some other interferon or Copaxone" and advised her to call in when she has made up her mind about which medication to use. (Id. at 199.)

A record dated October 25, 2005, indicates that Evans was suffering from "[p]ersistent sinusitis" and a "current flare" of MS. (Id. at 228.) She received IV infusions of Solu-Medrol in November 2005 and February 2006. (Id. at 311-13, 315, 323.)

From March 9 to March 14, 2006, Evans was hospitalized after she cut her wrists with a razor. (Id. at 260-79.) Records indicate that Evans suffered severe relapses of MS, which necessitated four hospitalizations for Solu-Medrol treatment. (Id. at 260.) As her symptoms increased, so did her depression and feelings of uselessness and hopelessness. (Id.) An MRI revealed demyelinating plaques from MS, "about 5 or 6 lesions in the cerebral hemisphere . . . and some diffusion suggestive of active lesions." (Id. at 261.) Evans' affect, insight, and willingness to share her feelings improved as her hospital stay progressed, and Virginia Aguilar Sincaban, M.D., recommended that Evans be committed to outpatient treatment. (Id. at 262.) Dr. Aguilar Sincaban's final diagnoses included "Mood disorder secondary to multiple sclerosis with severe depression and anxiety, suicidal"; "Multiple sclerosis, remitting and relapsing on Copaxone. Each relapse is worse than before"; and "Psychosocial stressors, severe, secondary to multiple sclerosis resulting in her

inability to function the way she wanted, financial difficulties, being fully dependent on her husband." (Id.)  Evan's GAF score was 10 upon her admission, and 61 upon her discharge.  (Id.)

On August 22, 2006, Nurse Duba completed a "Medical Source Statement." (Id. at 181-83.)  In her statement, Nurse Duba listed "Panic Disorder," "Bipolar type II," and MS (among other things) as Evans' diagnoses.  (Id. at 181.)  Nurse Duba noted that Evans "[d]oes fairly well when on meds," but she "doesn't like to take medicine so periodically stops, changes etc."  (Id.)  She opined that Evans was markedly limited in "[t]he ability to understand and remember detailed instructions"; "to maintain attention and concentration for exten[d]ed periods"; "to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; "to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; and "to travel in unfamiliar places or use public transportation." (Id. at 181-82.)  Nurse Duba also opined that Evans would miss more than four days of work per month due to her impairments or treatment.  (Id. at 183.)

On September 12, 2006, Evans visited Central Nebraska Orthopedics on a referral from Dr. Sadek.  (Id. at 239.)  Following an examination, Evans was diagnosed with bilateral trochanteric bursitis.  (Id.)  Her physician explained to Evans that "because of her MS she has abductor weakness and as a result secondary trochanteric bursitis."  (Id.)  He recommended that she begin an outpatient physical therapy program.  (Id.)  Evans attended physical therapy sessions on September 15, 18, 22, 25, 27, and 29, and on October 2, 4, 6, and 11.  (Id. at 572-81.)  The physical therapy record dated October 11, 2006, states that Evans was "just stiff" but no longer

10

feeling pain, and her physical therapy was discontinued due "to progress made." (Id. at 572.)

On December 11, 2006, Evans was examined by Pierre Fayad, M.D., and Kathleen Healey, APRN, at the Multiple Sclerosis Clinic at the Nebraska Medical Center. (Id. at 253-59.) Dr. Fayad wrote a letter to Dr. Sadek stating, in part, as follows:

> [Evans] was treated with Avonex for six months under which she had three attacks and felt tired and had difficulty tolerating it. She was switched to Copaxone in November of 2005 on which she has been for over a year. From March until now she has had at least two to three exacerbations. The most recent exacerbation happened in September when she had numbness involving her right arm and leg along with severe and disturbing sensation of itching and burning. She has unfortunately experienced severe psychiatric issues associated with both the Avonex which caused depression, and steroids which caused a suicide attempt in March of 2005. She has been hospitalized for psychiatric issues that are related to that. . . .
>
> . . . .
>
> Her examination shows mild ataxia but otherwise subtle deficits. Her gait is slightly unsteady.
>
> ASSESSMENT AND RECOMMENDATIONS:
>
> Ms. Evans has a well-established diagnosis of multiple sclerosis for the past year-and-a-half and has already had several exacerbations with involvement of the spinal cord. Unfortunately she has been intolerant of steroids which were associated with suicidal attempt and psychosis while Avonex was associated with depression and was intolerable. Even though she is tolerant of Copaxone she has continued to have attacks. Therefore it is reasonable to move on to another level of treatment in Tysabri. . . .

(Id. at 258-59.)

Evans visited the Multiple Sclerosis Clinic on April 5, 2007.  (Id. at 249-50.)
Nurse Healey noted that Evans received her third dose of Tysabri "and is doing well
. . . with no side effects and no problems."  (Id. at 249.)  Although Evans reported
intermittent right-sided stiffness and aches and some left-sided forehead pain, she had
no relapses or worsening of symptoms since taking Tysabri.  (Id.)

Evans received her sixth dose of Tysabri from Nurse Healey on July 5, 2007.
(Id. at 247-48.)  Nurse Healey noted that Evans "continues to have some mild
baseline symptoms including some mild aching behind the left eye on occasion, some
hyperesthesias to the right upper extremity and some numbness and tingling to her
feet." (Id. at 247.)  Evans also reported "some very mild issues with cognition."  (Id.)
Her fatigue was better, however, and Nurse Healey noted that she has "a mild amount
of disability" with "no clear indication of relapse or worsening of disease."  (Id. at
247-48.)

In a letter to Nurse Healey dated August 9, 2007, Dr. Gleason wrote that she
examined Evans "for a two-year follow up of her multiple sclerosis."  (Id. at 216-17.)
Evans reported no symptoms indicating a recurrence of internuclear ophtalmoplegia,
but did report left eye pain with movement "and some occasional pain secondary to
the strain."  (Id. at 216.)  She also reported that "[s]ince her episode of optic neuritis,
she feels she has 'Swiss cheese vision' of the left eye and sees double only at extreme
gaze when she looks over her shoulder."  (Id.)  Her visual acuity was 20/20 in each
eye.  (Id.)  Dr. Gleason wrote that Evans was instructed to return for a follow-up in
one year, or sooner if she has any new ocular symptoms.  (Id.)

On August 29, 2007, Evans visited Nurse Duba and reported that her MS was
"much better," and she had been taking only half of her prescribed dose of Remeron

for the past week.  (Id. at 236.)  Nurse Duba noted that Evans' mood was good, and she assessed a GAF score of 55.  (Id.)

Evans visited Nurse Healey on December 27, 2007, who noted that Evans had received her thirteenth dose of Tysabri and was doing well.  (Id. at 242.)  Evans continued "to complain of baseline symptoms of fatigue, some mild cognitive dysfunction and tightness of her muscles occasionally." (Id.) Nurse Healey advised Evans to speak with her psychiatric healthcare provider about replacing Paxil with "a more energizing antidepressant" such as Prozac or Effexor.  (Id.)  A brain MRI revealed "[m]ild nonspecific areas of increased T2 signal involving the splenium and the corpus callosum, right periatrial white matter, left superior cerebellum, and left superior cerebellar peduncle," which were unchanged from Evans' prior tests.  (Id. at 244.)

On February 11, 2008, Evans called Nurse Healey and reported experiencing "a sharp shooting pain to the left side of her jaw and cheek area."  (Id. at 241.)  Nurse Healey expressed concern that Evans' symptoms "sound like a trigeminal neuralgia" and "may suggest relapse."  (Id.)  She increased Evans' dose of Neurontin, instructed Evans to take Advil, and scheduled a brain imaging study.  (Id. at 241.)  A brain MRI study performed on February 14, 2008, revealed "[s]table stigmata of multiple sclerosis," "[p]robable acute inflammatory fluid in the right maxillary sinus," and "[n]o definite findings to explain the left trigeminal neuralgia."  (Id. at 240.)

On February 26, 2008, Evans reported to Nurse Duba that she was separating from her husband, and she was planning to move to Omaha to be near family.  (Id. at 235.)  Nevertheless, Evans' mood was good, her affect was "full," and she was pleasant and cooperative.  (Id.)  Nurse Duba also noted that Evans' overall condition had improved.  (Id.)

Evans visited Nurse Healey on October 23, 2008, and reported that "her disease has been stable although she has been having more urinary urgency and some rare episodes of urge incontinence." (Id. at 564.) She also reported "profound fatigue," "catching her right leg" and leg stiffness. (Id.) Nurse Healey noted that Evans was doing well on Tysabri, and she ordered tests to determine whether Evans' fatigue and urinary symptoms were related to her MS. (Id. at 565.) Nurse Healey also referred Evans to Dr. Elizabeth Dahl to clarify her psychiatric diagnosis, and she referred Evans to physical therapy "not only for MS issues but also for her emotional health and stress management." (Id.)

On November 11, 2008, Evans followed up with Nurse Healey and reported some right facial pain and a "little bit" of a "wobbly" feeling in her legs. (Id. at 561.) Nurse Healey ordered an increase in Evans' Neurontin and directed her to return in one month. (Id. at 562.)

Elizabeth Dahl, M.D., performed a mental health evaluation of Evans on November 20, 2008. (Id. at 557-60.) Evans was described as "fairly pessimistic about her MS and the course, despite her being relatively quite stable recently." (Id. at 557.) She declined to participate in a support group called "Operation Optimistic" because she did not like the name of the group, and she declined to participate in an MS exercise program because she had been told that the exercise room had no air conditioning. (Id. at 558.) Dr. Dahl's diagnoses included Bipolar Disorder, type II, unspecified, possibly exacerbated in the past by prescription steroid use; History of Panic Disorder; Multiple Sclerosis; and possible history of trigeminal neuralgia on the right. (Id. at 559.) She assessed a current GAF score of 45. (Id.) Changes were made to Evans' medications, and she was directed to return for a follow-up in a few weeks. (Id. at 560.)

Evans visited Nurse Healey on December 24, 2008, and reported that she continued to suffer right sided facial pain. (Id. at 554-55.) She also reported "some mild weakness to her lower extremities," but Nurse Healey noted that Evans "still has not undertaken a regular exercise program." (Id. at 554.) Evans felt that she was still unable to work due to fatigue, "some cognitive slowing," and occasional balance problems. (Id.) Nurse Healey indicated that Evans' MS was stable in Tysabri; that her trigeminal neuralgia was "fairly well controlled"; that her mood was more stable; and that she was to begin a "structured regular exercise program" to address her weakness. (Id. at 555.)

On December 30, 2008, Evans followed up with Dr. Dahl. (Id. at 552-53.) Dr. Dahl noted that since Evans' last visit, she had "improvement in her mood with fewer mood swings, fewer depressive symptoms and a more upbeat, optimistic attitude." (Id. at 552.) Evans still complained of low energy, however. (Id.) Dr. Dahl made adjustments to Evans' medications. (Id. at 553.)

Evans visited Dr. Dahl again on January 22, 2009, and reported that she was feeling "substantially better." (Id. at 550.) She added that "[t]he problem that she said she had all her life with inattentiveness and distractibility has resolved with the Ritalin," which allows her to "stick with a task." (Id.) Her mood was "better," and she was feeling more energetic. (Id.) Dr. Dahl made further adjustments to Evans' medications. (Id. at 551.)

An MRI performed on February 21, 2009, revealed no changes in Evans' condition. (Id. at 549.) She followed up with Nurse Healey on February 26, 2009, and reported that she occasionally experiences pain on the right side of her face due to trigeminal neuralgia, but she is pain-free when she takes her medication. (Id. at 546.) Nurse Healey described Evans' "baseline symptoms" as "fatigue, some mild

15

problems with balance and gait, reported mild cognitive dysfunction, and neuralgia." (Id.)

On March 11, 2009, Evans visited Nurse Healey and reported that she has been feeling an extremely painful "band-like shocking-sticking sensation" extending around her upper waist. (Id. at 543.) Nurse Healey noted that Evans might be suffering a relapse, made changes to her medications, and ordered an MRI and other testing. (Id. at 544.) Nurse Healey also noted that "[b]ecause her symptoms are somewhat atypical and her pain seems to be out of proportion to what we see with myelitis, we would recommend that she have a chest x-ray done as well as an abdominal ultrasound to search for other underlying etiologies." (Id.) An MRI performed on Evans' spine on March 12, 2009, revealed a normal thoracic spine and nonspecific lesions in the cervical spine consistent with Evans' MS diagnosis. (Id. at 542.) On March 17, 2009, Evans spoke with Nurse Healey over the phone and reported that the pain around her waist "significantly improved with high doses of ibuprofen around the clock as well as Neurontin." (Id. at 541.) An abdominal ultrasound performed on March 19, 2009, was normal. (Id. at 540.)

Evans visited Dr. Dahl on March 23, 2009, and reported her mood had been good and she had been suffering no panic attacks despite the pain around her waist, medication-related issues, and "stressful events in her household." (Id. at 538.) Dr. Dahl made adjustments to Evans' medications. (Id. at 538.)

On June 23, 2009, Evans visited Chris Criscuolo, M.D., at the Village Pointe Pain Center on a referral from Nurse Healey. (Id. at 533.) She complained of thoracic pain and a "spasm in the chest wall that wraps around anteriorly." (Id.) She also reported trigeminal neuralgia pain, torso pain, pain in both legs, and left eye pain. (Id.) Dr. Criscuolo assessed "myofascial pain secondary to multiple sclerosis" and

16

"chest wall pain," and he prescribed medications.  (Id. at 534.)

Evans visited Nurse Healey on August 18, 2009, for a routine follow-up.  (Id. at 529.)  Nurse Healey noted that Evans generally "has relatively mild disability associated with her disease," but on this day she was reporting blurred vision in both eyes, cramping throughout her body, a hugging sensation around her chest, mild problems with balance, and mild bladder dysfunction.  (Id.)  She also reported that she felt that she was "worsening on Tysabri."  (Id.)  Nurse Healey expressed disagreement with Evans' report that her condition was worsening, and she suggested getting a second opinion "to reassure the patient that . . . she is doing quite well at this time with minimal disability."  (Id. at 530.)  Nurse Healey instructed Evans to meet with a Dr. Zabad for a second opinion, continue following up with Dr. Dahl and Dr. Criscuolo, and undergo a full ophthalmological exam.  (Id. at 530-31.)

On November 17, 2009, Evans was examined by Rana Zabad, M.D., at the Multiple Sclerosis Clinic.  (Id. at 526-28.)  Evans expressed concerns about remaining on long term Tysabri therapy and the fact that she was not symptom-free.  (Id. at 526-27.)  Dr. Zabad answered Evans' questions, and Evans elected to reduce her Tysabri treatments to every other month.  (Id. at 527.)  Dr. Zabad also made changes to Evans' medication regimen to address her remaining concerns.  (Id.)

On November 24, 2009, Evans visited Nurse Healey and reported that she had now decided to stop completely her Tysabri therapy and start Copaxone.  (Id. at 524.)  Nurse Healey made the requested adjustment in Evans' medications.  (Id. at 525.)

Evans visited Dr. Dahl on January 5, 2010, and reported that she had been doing very well "[f]rom an emotional perspective," and her MS had been stable.  (Id. at 521.)  Dr. Dahl noted that Evans' type II Bipolar disorder had been addressed "successfully with generic Lamictal, history of Panic disorder with generic Zoloft,

17

and Attention Deficit disorder symptomatolgy with Methylpehnidate." (Id.)  Evans was still suffering from "MS fatigue," however, and Dr. Dahl made adjustments to her medications to attempt to address it.  (Id. at 521-22.)

On March 2, 2010, Evans followed up with Nurse Healey and reported that she was experiencing occasional paresthesias to the right arm and leg and a hugging sensation around her upper waist.  (Id. at 517.)  Evans also reported "jumpiness and twitchiness."  (Id.)  An examination revealed "very few findings," and Nurse Healey opined that Evans was stable.  (Id. at 518.)  Nurse Healey also opined that Evans' "gait is exaggerated and out of proportion to her other aspects of the physical exam." (Id.)  She noted that an MRI taken in February revealed a slight increase in the size of one lesion, but no additional lesions, no active lesions, and no brain atrophy.  (Id. at 518-19.)

In a record dated March 23, 2010, Dr. Dahl noted that Evans' sister called during the previous week and reported that Evans attempted to make superficial cuts on her arms.  (Id. at 515.)  Evans admitted that she had some suicidal thoughts, but she said that she had too much to live for and liked herself too much to commit suicide.  (Id.)  Dr. Dahl advised Evans to call a clinician, get help, and come to the emergency room when she experiences distress.  (Id. at 516.)  She also made adjustments to Evans' medications.  (Id.)

Evans visited Nurse Healey on May 25, 2010, and reported that she was experiencing additional numbness on the right side.  (Id. at 512.)  She also reported a worsening of her gait and "more discoordination on the right side."  (Id.)  Nurse Healey described Evans' baseline disability as "relatively mild consisting of paresthesias to the right side, [and] chronic intermittent banding sensation around her abdominal area."  (Id.)  Nurse Healey also noted that Evans was accompanied by her

18

teenage foster child.  (Id. at 513.)  Examination revealed "mild deficits," and Nurse Healey indicated that Evans' "gait dysfunction is out of proportion to what I appreciate on exam."  (Id.)  She ordered MRIs and recommended that Evans begin a formal physical therapy program for her gait.  (Id.)

## B.  Hearing Testimony

As noted previously, Evans participated in hearings before ALJs on June 17, 2008, and October 15, 2010.  (E.g., Tr. at 343-380, 584-629.)  During the hearing on June 17, 2008, Evans testified that she stopped working in 2004 because of her multiple sclerosis.  (Id. at 350.)  She said that her MS causes the following symptoms: optic neuritis in the left eye, which impairs her vision and causes pain; numbness and pain in the right leg, which affects her ability to walk; diminished sensation in the right arm; trigeminal neuralgia in the face, which causes pain; overwhelming, continuous fatigue; depression, which causes suicidal feelings, isolation, memory problems, and concentration problems; anxiety, which causes her other symptoms to intensify; and muscle cramping in her legs and right shoulder.  (Id. at 350-60.)  She said that she can perform chores, shower, and shop for groceries within about two hours after she wakes up in the morning, but then she must rest for half an hour before she can attempt another task.  (Id. at 354-55.)  Evans is able to drive, clean dishes and floors, and prepare midday and evening meals, but her sister (with whom Evans lives) does the laundry.  (Id. at 360-61.)

Evans said that she could sit for about 40 minutes without standing to move around, and she could stand for about 30 minutes.  (Id. at 363-64.)  Later, she indicated that she could sit for stretches of 30 or 45 minutes about two or three times within an eight-hour period.  (Id. at 367, 370.)  She also opined that she could stand for a total of 30 minutes and walk for about 20 minutes in an eight-hour period.  (Id.

at 367.)  Evans said that she could lift and carry a gallon of milk with her left arm. (Id. at 364-65.)

Evans testified that she has two or three intense periods of symptoms per year, each lasting a minimum of six weeks.  (Id. at 368.)  She said that her medication is very helpful, but some of her medications increase her fatigue.  (Id.)

During the second hearing, which was held before a different ALJ on October 15, 2010, Evans testified that her multiple sclerosis came on fast and progressed rapidly.  (Id. at 587-88.)  Her MS symptoms include lost vision in her left eye; numbness in her legs and right side; balance problems; the "MS hug"; trigeminal neuralgia; eye, leg, hip, and knee pain; bladder urgency; and constipation.  (Id. at 588. See also id. at 591-92, 594, 595-96.)  She also said that she suffers depression (which makes her suicidal) and anxiety (which causes her to be extremely uncomfortable around other people).  (Id. at 588-89.)  She added that she suffers from fatigue, (id. at 589), and her pain interferes with her ability to concentrate, (id. at 595-96.)

Evans testified that she could stand for about 20 minutes before her legs become weak, and she could sit for 30 to 45 minutes.  (Id. at 591, 593-94.)  She explained that she "usually hit[s] the couch about noon and from there it's just a process of [resting] a bit, [trying to] do something," and resting again without "push[ing] it too far, too hard."  (Id. at 597.)

Dr. Woodrow Janese, a neurologist, also testified at the hearing.  (Id. at 597-98. See also id. at 400.)  Dr. Janese explained that Evans did not "meet or equal the diagnosis of 11.09 based on" the objective evidence.  (Id. at 602.)  More specifically, Dr. Janese reviewed the records and questioned whether the diagnosis of trigeminal neuralgia was valid based on the symptoms described by Evans.  (Id. at 600-01.)  He also noted that the records lacked evidence of ataxia, intention tremor, nystagmus,

20

dysarthria, and abnormal speech symptoms associated with relapsing and remitting multiple sclerosis. (Id. at 601. See also id. at 606-07 (explaining the distinction between symptoms described by the patient and signs used to diagnose the disease).) In addition, Dr. Janese noted that the records did not substantiate Evans' testimony about vision impairment. (Id. at 601.) He added that he could not find any objective evidence that Evans had an exertional disability. (Id. at 602. See also id. at 603.) He believed that there was no objective basis for imposing a lifting restriction, and Dr. Janese opined that Evans could stand and walk for six hours. (Id. at 602-03.) He did state, however, that Evans should avoid temperatures greater than 105 for longer than two or three hours, and she should not be exposed to noise greater than 90 decibels. (Id. at 604-05.)

Dr. Thomas England also testified during the October 15, 2010, hearing. (Id. at 610.) Based on his review of the record and the lack of evidence of "periods of manic or hypomanic behavior," Dr. England opined that "mood disorder" would be a more appropriate diagnosis for Evans than bipolar disorder type II. (Id. at 613.) He added, however, that the difference between these diagnoses was "not considerable," and the medicines used to treat both "would essentially be the same." (Id. at 614.) Dr. England also opined that although she had a history of panic disorder, Evans had no "ongoing" anxiety disorder diagnosis. (Id. at 614-15, 616.)

Dr. England testified that Evans suffered two significant episodes of severe depression. (Id. at 615, 617.) He explained that these two episodes were centered around Evans' suicide attempt (i.e., January to March 2006) and the commencement of her treatment with Dr. Dahl (i.e., September 2008 to January 2009). (Id. at 615-16, 617-18.) Dr. England opined that during these two periods, Evans suffered marked limitations in her ability to function. (Id. at 617-21.) Otherwise, her psychological

21

impairments caused mild to moderate limitations in her ability to function.  (See id.)

Finally, a vocational expert (VE) testified at the October 15, 2010, hearing. (Id. at 624.)  The ALJ asked the VE a lengthy hypothetical question:

> Assume for purposes of all the following hypothetical questions that the claimant was 30 years of age at onset and has educational abilities commiserate [sic] with a 12th grade education and two years of college.  This is an individual who has been diagnosed with multiple sclerosis and she's also been diagnosed with mood disorder and in 2010 ADHD.  She has a history of panic disorder which is in remission.  This is an individual that can stand and walk six hours out of eight.  She should avoid concentrated exposure to heat over 105 degrees for two or three hours at a time and noise she should be limited to 90 decibels. . . .
>
>         . . . .
>
> Okay, she'd be at a marked level [of limitation] from, now first this individual has an onset date of 12/20/04 and she would be at a marked level at understanding, remembering and carrying out short and simple instructions from January of '06 through March of '06 and from September of '08 through February of '09.  Otherwise she'd be none to slight in understanding, remembering and short and simple instructions. This is an individual who is mild to moderate in interacting with the public, supervisors and co-workers except for a marked time from January of '06 through March of '06 and September of '08 through February of '09 and she would be moderate in responding appropriately to work pressures in a usual work setting except for the two periods of decompensation I cited earlier and then she'd be marked, right.  And she'd be mild to moderate in responding appropriately to changes in a routine work setting.  However, she would be marked at the two times for decompensation.  This is an individual who would have none to mild restrictions of activities of daily living, mild to moderate difficulties in social functioning with marked problems in social functioning from one of '06 to three of '06 and from nine of '08 to two of '09.  She would be mild to moderate in difficulties in maintaining concentration, persistence and pace except for the two periods marked from one of '06 to three of

22

'06 and nine of '08 to two of '09 and she would have two episodes of decompensation each of an extended duration from one of '06 to three of '06 and from nine of '08 to two of '09 and C criteria. Can she do her past relevant work?

(Id. at 625-27.) The VE responded, "I believe she could do the work that she did in the past under that hypothetical if we take out those two exacerbation periods. She obviously, I don't believe she could do that work or any work or keep the job during those periods of time so I guess the issue becomes how frequently do those [occur?]" (Id. at 627.) After the ALJ interjected, "Well, she has an onset of '04 and this is 2010," the VE continued,

That's right, so it appears about every two years this happens so the issue becomes can she keep the job for that period of exacerbation so that she can continue when she's not having an exacerbation and I think given the type of work that she has done in the past and the basically semiskilled and unskilled nature of the work that she's done she'd have trouble holding the job once that exacerbation begins I don't believe they would take her back when she returns.

(Id. at 627-28.) When asked whether there would be other work in the national economy for this person, the VE responded, "I think after the exacerbation she could go out and become employed in a multitude of unskilled positions but the pattern would probably repeat herself," which would cause her to lose her job due to an exacerbation "[i]n about a year or two." (Id. at 628.)

## C.    The ALJ's Decision

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520(a); id. § 416.920(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. See 20 C.F.R. § 404.1520(a); id. § 416.920(a) In this case, the ALJ proceeded to step

23

four and found Evans to be not disabled.  (See Tr. at 400-08.)

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity.  See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b).  If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b).  In a decision dated October 22, 2010, the ALJ found that Evans "has not engaged in substantial gainful activity since December 20, 2004, the alleged onset date."  (Tr. at 402 (citations omitted).)

Step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. § 404.1520(c); id. § 416.920(c).  A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement."  See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."); id. § 416.920(a)(4)(ii), (c); id. § 416.909.  Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting."  20 C.F.R. § 404.1521(b); id. § 416.921(b).  If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 416.920(a)(4)(ii), (c).  The ALJ found that Evans "has the following severe impairments: multiple sclerosis; an emotional disorder; and an anxiety disorder."  (Tr. at 402 (citations omitted).)

24

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments.  See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id. § 416.920(a)(4)(iii); see also 20 C.F.R. Part 404, Subpart P, App'x 1.  If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled."  See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id. § 416.920(a)(4)(iii).  If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five.  See 20 C.F.R. § 404.1520(a); id. § 416.920(a).  The ALJ found that Evans "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments."  (Tr. at 403 (citations omitted).)

Step four requires the ALJ to consider the claimant's residual functional capacity (RFC)[5] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work."  See 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f); id. § 416.920(a)(4)(iv), (e), (f).  If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(iv), (f); id. § 416.920(a)(4)(iv), (f).  The ALJ wrote:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform "light" work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she must avoid work where she would be exposed to temperatures of over 105 degrees for more than two to three hours at a time and where she would be exposed to noise levels greater than 90 decibels.  She has no more than "moderate" limits in her ability to understand and remember instructions; to interact with others in a work setting; to respond to work

---

[5] "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments."  Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).  See also 20 C.F.R. § 416.945(a).

pressures and schedules; and to maintain her concentration, persistence, and pace.

(Tr. at 404.)  The ALJ also found that Evans "is capable of performing past relevant work as a general merchandise sales person and informal waitress.  This work does not require the performance of work related activities precluded by the claimant's residual functional capacity."  (Id. at 407.)  Based on the foregoing, the ALJ concluded that Evans "has not been under a disabilty, as defined in the Social Security Act, from December 20, 2004, through the date of this decision."  (Id. at 408 (citations omitted).)

### III.    STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)).  See also Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted). A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal

quotation marks omitted).  See also Moore v. Astrue, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

I must also determine whether the Commissioner's decision "is based on legal error." Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (quoting Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000)).  "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." Id. (citations omitted).  No deference is owed to the Commissioner's legal conclusions.  See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).  See also Collins, 648 F.3d at 871 (indicating that the question of whether the ALJ's decision is based on legal error is reviewed de novo).

## IV.   ANALYSIS

Evans argues that the Commissioner's decision must be reversed because the ALJ's residual functional capacity finding is not supported by substantial evidence. (Pl.'s Br. at 11, ECF No. 14.)  More specifically, she argues that the ALJ failed to weigh and discuss the opinions of Dr. Janese and Dr. England; failed to provide a "narrative discussion describing how the evidence supports each conclusion" incorporated into her RFC finding; and based her RFC determination solely on the opinions of non-treating, non-examining physicians.  (Id. at 11-16.)  I shall analyze each of her arguments in turn.

### A.   The Opinions of the Testifying Medical Experts

Evans argues first that the ALJ erred by failing to analyze the testimony of Drs. Janese and England adequately.  (Pl.'s Br. at 11, ECF No. 14.)  Citing 20 C.F.R. §

404.1527(d), 20 C.F.R. § 416.927(d), and SSR 96-6p, Evans submits that the ALJ failed to explain the weight that was given to each doctor's opinion. (Pl.'s Br. at 12, ECF No. 14.)

The applicable regulations list factors that the Commissioner considers when determining the weight to be given to a medical opinion. See 20 C.F.R. §§ 404.1527; 416.927. In accordance with these regulations, the opinions of Drs. Janese and England are entitled to relatively less weight because these experts were neither treating nor examining physicians; indeed, their opinions cannot be given "controlling weight." See 20 C.F.R. §§ 404.1527(c)(1)-(2), (e)(2); 416.927(c)(1)-(2), (e)(2). Other factors relevant to the task of assigning weight to their opinions include the supportability of the physicians' opinions, the consistency of their opinions, and the fact that they opined about matters related to their areas of specialty; also, any additional factor "which tend[s] to support or contradict the opinion[s]" may be considered. See 20 C.F.R. §§ 404.1527(c)(3)-(6), (e)(2); 416.927(c)(3)-(6), (e)(2). Significantly, Social Security Ruling (SSR) 96-6p states that Administrative Law Judges cannot ignore the opinions of nonexaming medical sources "and must explain the weight given to these opinions in their decisions." 1996 WL 374180, at *1.

The ALJ's decision does include some discussion of Dr. England's and Dr. Janese's opinions. (See Tr. at 403-04, 406.) Thus, it cannot be said that their opinions were "ignore[d]." SSR 96-6p, 1996 WL 374180, at *1. After careful consideration, I find that the ALJ adequately explained the weight that was given to Dr. England's opinions. I also find, however, that the ALJ did not adequately explain the weight that was given to Dr. Janese's opinions.

The ALJ's step three analysis includes the following discussion of Dr. England's opinions:

28

That expert [(i.e., Dr. England)] testified that the claimant had an exacerbation of her emotional condition in March of 2006 when she was hospitalized after making a suicide gesture. He stated his opinion that she likely had decreased functioning for few months around that time. However, apart from that relatively brief period of poor functioning, the medical expert did not find any areas of functioning in which the claimant would have more than "moderate" limits.

The medical expert also testified concerning another period of exacerbation around the end of 2008 and the first two months of 2009. The documentary evidence does not support a finding of any period of limited functioning around that time. Therefore, the undersigned does not find that there was a second period of exacerbation.

. . . .

Giving her the benefit of the doubt, the undersigned finds that the claimant has experienced one episode of decompensation.

(Tr. at 403-04.) Although the ALJ did not specify the degree of weight that was afforded to Dr. England's opinion, it is clear that she credited Dr. England's opinion that Evans experienced an episode of decompensation in March 2006. The ALJ also explained that she gave no weight to Dr. England's opinion that Evans suffered "a second period of exacerbation" in 2008-2009 because, in her view, his opinion was not supported by the record. I find that this explanation is sufficient to satisfy the requirements of SSR 96-6p.[6]

---

[6] The record shows, however, that Evans was referred to Dr. Dahl in October 23, 2008, by Nurse Healey, and upon examination, Dr. Dahl diagnosed Bipolar Disorder and assigned Evans a GAF score of 45. (See Tr. at 557-60, 565.) Thus, the ALJ's finding that "[t]he documentary evidence does not support a finding of any period of limited functioning" around the end of 2008, (Tr. at 404), is contradicted by the medical evidence. I shall address this issue more thoroughly below.

Evans argues that the ALJ failed to discuss Dr. England's opinions about Evans' periods of decompensation "in connection with her residual functional capacity findings." (Pl.'s Br. at 13, ECF No. 14.)  It is true that the ALJ discussed Dr. England's testimony in her step 3 analysis, prior to assessing Evans' RFC.  (See Tr. at 404.)  It is clear, however, that she applied the same finding (i.e., that Evans suffered only one episode of decompensation) in her step 4 analysis.  (See id. at 407-408.)  I am not persuaded that the ALJ erred by failing to repeat her discussion of Dr. England's testimony about decompensation.

Evans also argues that the ALJ failed to explain the inconsistency between Dr. England's diagnosis of "mood disorder" and Dr. Dahl's diagnosis of Bipolar II disorder.  (Pl.'s Br. at 13, ECF No. 14.)  Evans' argument is not without merit.  The ALJ ought to have explained why she credited the opinion of the testifying expert over the diagnosis of the treating psychiatrist, whose opinions may well have merited substantial (if not controlling) weight.  I note, however, that the ALJ asked Dr. England about this very inconsistency during the hearing, and Dr. England testified that the difference between the diagnoses was "technical."  (Tr. at 614.)  He added that in either case, the diagnosis falls under "12.04" and primarily involves depression.  (Id.)  Under the circumstances of this case, I find that the ALJ's failure to explain why she gave more weight to Dr. England's testimony than to Dr. Dahl's records does not require remand.[7]

---

[7] Evans also claims that the ALJ's RFC findings are generally in conflict with Dr. England's testimony about Evans' mental limitations.  (Pl.'s Br. at 12-13, ECF No. 14 (citing Tr. at 19-20).)  I note, however, that Evans refers here to the findings made by the first ALJ in the decision dated July 17, 2008.  These findings predate Dr. England's testimony by more than two years; the decision by the second ALJ, which is dated October 22, 2010, is currently under review.

The ALJ's decision includes the following paragraph about Dr. Janese's testimony:

> As for the opinion evidence, the medical expert at the hearing testified that he could find no objective evidence in the record to establish any significant exertional limits. He also noted that the documentary evidence shows that her coordination is normal and that it does not reflect any problem with her balance. He testified that the type of multiple sclerosis that has been diagnosed her [sic] typically involves "remission" of the signs and symptoms for periods of time in contrast to the claimant's testimony in which she described generally continuous symptoms over the years.

(Tr. at 406.) It appears that the ALJ relied on Dr. Janese's testimony to discredit Evans' testimony. In so doing, however, the ALJ did not explain the weight that was given to Dr. Janese's opinions.

The ALJ's failure to explain the weight that was afforded to Dr. Janese's testimony is not a mere technical deficiency; it introduces substantial ambiguity into the ALJ's analysis. On the question of Evans' RFC, the ALJ seems to have given greater weight to Dr. Janese's opinion than to Evans' own testimony about her limitations. At the same time, however, the ALJ evidently rejected Dr. Janese's opinion that Evans has no significant exertional limitations, as the ALJ's RFC findings limit Evans to a subset of light work. Under the circumstances, I find that a remand is necessary so that the Commissioner can explain, in accordance with SSR 96-6p and the applicable regulations, the weight that was afforded to Dr. Janese's testimony. Cf. Willcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008) (remanding case in part because the court could not determine whether the ALJ properly weighed the opinion of a nonexamining state medical consultant).

### B.    The Evidence Supporting the RFC Determination

Evans argues next that the ALJ failed to describe how the evidence supports

her conclusion that Evans retains the RFC to perform "light work on a regular and continuing basis." (Pl.'s Br. at 14, ECF No. 14.)  I agree.  "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).  In this case, the ALJ's "narrative discussion" is inadequate.  Indeed, the decision includes no discussion of "specific medical facts" that support the ALJ's finding that Evans was capable of light work.

In response to Evans' argument, the Commissioner claims that "the ALJ specifically relied upon Dr. Janese's opinion and testimony that Plaintiff did not have any significant exertional limitations," and this testimony supports the finding that Evans "could perform the lifting and standing requirements for light work."  (Def.'s Br. at 26, ECF No. 19 (citing Tr. at 406).)  It is fair to say that if Evans truly had no exertional limitations, it follows that she could perform the exertional requirements of light work.  It merits repeating, however, that for some unspecified reason, the ALJ seems to have rejected Dr. Janese's opinion that Evans had no significant exertional limitations; she evidently concluded instead that Evans had some exertional limitations but nevertheless retained the RFC for light work.  The ALJ's narrative discussion fails to describe how the evidence supports this conclusion.  Relatedly, and as noted in the previous section of this memorandum, the ALJ failed to explain the weight that was afforded to Dr. Janese's opinion.  In short, I am not convinced that the ALJ's reference to Dr. Janese's partly-credited, "unweighed" opinion can be said to support the finding that Evans was capable of light work.

The Commissioner argues that the ALJ's error is harmless because the ALJ's RFC finding is consistent with Dr. Reed's opinion that Evans could perform light

work.  (Def.'s Br. at 25, ECF No. 19.)  I agree that there is evidence in the record that might support the ALJ's RFC finding, including portions of Dr. Reed's opinion. Here, however, there is no indication that the ALJ relied on Dr. Reed's opinion: The ALJ did not cite or otherwise discuss Dr. Reed's report, nor did she explain how she weighed Dr. Reed's opinions as required under 20 C.F.R. §§ 404.1527; 20 C.F.R. § 416.927; and SSR 96-6p.  As Judge Kopf explained in his decision reversing the first ALJ's decision denying Evans' claims, "my review is concerned with what the ALJ actually considered."  Evans v. Astrue, No. 4:08CV3266, 2010 WL 1664973, at *10 (D. Neb. April 22, 2010).  The Commissioner cannot cite Dr. Reed's opinions to forge a "post hoc rationale" for the ALJ's RFC determination when the ALJ's decision includes no discussion of those opinions.  Id.[8]

The Commissioner also emphasizes that the ALJ assigned greater limitations to Evans than did Dr. Janese, and she submits that "there is no error when an ALJ assigns greater limitations than assessed by a medical expert."  (Def.'s Br. at 22, ECF No. 19.)  In support of its argument, the Commissioner cites Mounts v. Astrue, 479 F. App'x 860, 868 n.2 (10th Cir. 2012), wherein the court wrote, "Mounts complains there was no evidence to support the ALJ's limitation that she only have occasional dealing with the general public.  Because this additional limitation works to her benefit, we decline to address the argument."  (See also Def.'s Br. at 22, ECF No. 19.)

It is true that the ALJ evidently found that Evans had some exertional limitations, while Dr. Janese opined that she had no limitations.  Because the ALJ

---

[8] Even if I were to assume, for the sake of argument, that the ALJ did rely on Dr. Reed's opinion to determine Evans' RFC, I note that the ALJ failed to explain why her RFC assessment excludes certain postural and environmental work limitations identified by Dr. Reed.   (See Tr. at 158, 160, 404.)

failed to explain how Dr. Janese's opinion was weighed, however, it is not clear that the ALJ merely added an "additional limitation" beyond those that were supported by substantial evidence. In other words, because the ALJ failed to describe how the evidence supports the conclusion that Evans' exertional limitations render her capable of light work, it is not apparent that the ALJ's assessment of Evans' exertional limitations "works to her benefit."

In short, a remand is necessary because the ALJ did not explain how the evidence supports her findings about the extent of Evans' exertional limitations.

### C.  The ALJ's Reliance on Opinions of Non-treating, Non-examining Physicians

Finally, Evans argues that the ALJ erred insofar as she based her RFC conclusions on the opinions of Dr. Reed, Dr. Janese, and Dr. England. Citing Nevland v. Apfel, 204 F.3d 853 (8th Cir. 2000) and other cases, Evans claims that the opinions of physicians who have not examined the claimant do not constitute substantial evidence upon which an RFC determination can be made. (Pl.'s Br. at 15-16, ECF No. 14.)

In Nevland, the Eighth Circuit "reversed an ALJ's decision because he relied on the opinions of nontreating, nonexamining physicians in determining the claimant's RFC."  Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (citing Nevland, 204 F.3d at 858). The court has since clarified, however, that "Nevland addressed the evidence necessary to satisfy an ALJ's burden of proof at step five in the disability analysis; Nevland does not preclude the ALJ's reliance on a reviewing physician's report at step four when the burden is on the claimant to establish an inability to do past relevant work." Id. (citations omitted). Because the instant case was resolved at step four of the sequential analysis, Evans' reliance upon Nevland is misplaced.

### D.    Additional Matters to Address on Remand

For the reasons set forth above, this action must be remanded to the Commissioner for further proceedings.  In addition to the issues addressed above, the following points should be addressed on remand.

As I noted previously, the ALJ rejected Dr. England's opinion that Evans suffered a second period of exacerbation in late 2008 and early 2009, stating, "The documentary evidence does not support a finding of any period of limited functioning around that time."  (Tr. at 404.  <u>See also</u> <u>supra</u> note 6.)  In fact, however, there is evidence that Dr. Dahl diagnosed Evans with Bipolar Disorder and assigned Evans a GAF score of 45 on November 20, 2008.  (<u>See</u> Tr. at 557-560.)  This discrepancy should be addressed.

Relatedly, the VE opined that the worker described in the ALJ's hypothetical "could do the work that she did in the past under that hypothetical if we <u>take out those two</u> exacerbation periods."  (Tr. at 627 (emphasis added).)  The VE also opined that if the hypothetical worker experienced exacerbations every two years, she would probably lose her job during the period of exacerbation and be unlikely to regain it when the exacerbation abated.  (<u>Id.</u> at 627-28.)  The ALJ found that Evans experienced <u>one</u> exacerbation during the relevant time period, and she concluded that the VE's testimony supported the conclusion that Evans could return to her past work given her RFC.  (<u>Id.</u> at 403-04, 407-08.)  The implications of the VE's testimony should be reconsidered on remand, particularly if adjustments are made to the ALJ's RFC findings and/or her findings about the frequency of Evans' exacerbations.

**IT IS ORDERED** that the Commissioner of Social Security's decision is reversed.

Dated January 2, 2014.

BY THE COURT

Warren K. Urbom
United States Senior District Judge